IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

C. JOHN HIRSCHFELDER                    )
and JANICE L. HIRSCHFELDER,             )
                                        )
              Plaintiffs,               )    TC-MD 120177C
                                        )
      v.                                )
                                        )
MARION COUNTY ASSESSOR,                 )
                                        )
              Defendant.                )    **DECISION**

Plaintiffs have appealed the real market value (RMV) of certain real property identified

in the Assessor's records as Account R93190 for the 2011-12 tax year. Trial in the matter was

held by telephone on August 27, 2012. C. John Hirschfelder (Hirschfelder) appeared for

Plaintiffs and testified on their behalf. Kara Driskell (Driskell) represented Defendant.

I.  STATEMENT OF FACTS

The subject property is a two story single family dwelling with four bedrooms, two full

bathrooms, two half bathrooms, and an 824 square-foot attached three-car garage, sitting on a

0.34 acre lot in Salem, Oregon, on the south end of town. (Def's Ex B at 1.) The home was built

in 1978, but was partially remodeled approximately 20 years later. (*Id.* at 3.)

Hirschfelder testified that Plaintiffs acquired the property on December 13, 2010, from

The Federal Home Loan Mortgage Loan Corporation (Freddie Mac), through an online bid

conducted by a third party specializing in such matters. Hirschfelder testified that they paid

/ / /

/ / /

/ / /

/ / /

$175,000 in cash for the property (*i.e.*, no financing was needed). The parties agree the home has 3,074 square-feet of living space.[1] (Def's Ex B at 3.)

The home has some very nice features including hardwood and tile floors, vaulted ceilings, and a bathroom described by Driskell as "upscale." (*See also* Def's Ex C at 2-7.) The Multiple Listing Service listing for the subject property at the time Plaintiffs were considering, and ultimately bought, the home, includes the following description:

> "Oasis in the city! Large lot with mature trees and vinyl fencing is very private! Huge garage with extra tall RV bay and lots of parking in the huge driveway. Covered pavilion with gas BBQ great for entertaining. Many updates inside including breath-taking kitchen with slab[] granite counters, cherry cabinets, appliances, trash compactor and gas fireplace."

(*Id.* at 1.) Hirschfelder testified that the asking price for the home in October 2010, less than two months before Plaintiffs purchased the property, was $250,000. (Ptfs' Ex 19; Def's Ex C at 1.) The home was originally listed in July 2008 for $359,900. (Ptfs' Ex 19.)

The RMV on the assessment and tax rolls, as initially determined by the assessor, was $274,380, with $80,340 allocated to the land and $194,040 to the improvements (the home). (Def's Ex B at 4.) Plaintiffs purchased the home for $175,000 in December 2010. (Ptfs' Ex 17.) Based on their then-recent purchase, Plaintiffs appealed the $274,380 RMV to the Marion County Board of Property Tax Appeals (BOPTA), and BOPTA reduced the RMV to $250,000, a reduction of more than $24,000. (Def's Ex B at 4.) The maximum assessed value (MAV) remained unchanged at $261,070, but, by virtue of the applicable Oregon statute, ORS 308.146(2), the assessed value (AV) was reduced from $261,070 to $250,000. Plaintiffs

---

[1] Hirschfelder testified that he initially believed that the home was 2,851 square-feet because that was the figure listed in the assessor's records. He acknowledged at trial that the home was slightly more than 3,000 square-feet, and later stated he agreed with Defendant's corrected square footage of 3,074. Driskell acknowledged at trial that the assessor's records initially contained an error regarding the size of the home; the assessor's office had not adjusted its records to account for any increase in size following an earlier home addition and kitchen remodel that appears to have occurred on or about 1998. (Def's Ex B at 3.)

have appealed that reduced BOPTA value to this court, requesting a reduction in the RMV to their $175,000 purchase price. In its Answer, Defendant requested that the court sustain the BOPTA RMV of $250,000. Defendant reiterated that request at trial, notwithstanding Driskell's market value analysis, which found a value range between $280,642 and $315,030. (Def's Ex B at 3.)

## II. ANALYSIS

A.    *Applicable law*

At issue in this case is the RMV, for the 2011-12 tax year, of a four bedroom, two-plus bathroom home with an attached garage, built in 1978, and sitting on one-third acre lot. The applicable assessment date is January 1, 2011. ORS 308.007; ORS 308.210.[2]

RMV "is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). RMV is defined by statute as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2).

While there are three recognized methods for valuing property, the sales comparison approach is generally viewed as most appropriate for valuing residential property. OAR 150-308.205-(A)(2). This is particularly true for older properties such as the subject, because substantial adjustments must be made under the cost approach, and if the property is not

---

[2] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

generating income, the income capitalization approach is typically inapplicable .[3] In this case, both parties utilized the sales comparison approach. Plaintiffs also rely on their purchase of the property approximately one month before the January 1, 2011, assessment date.

Under the sales comparison approach, the court looks at arm's-length sales transactions of similar properties to determine a correct RMV. *Richardson*, TC-MD No 020869D. The "similar properties," typically referred to as "comparable sales," must be adjusted to account for differences between those properties and the property being appraised. Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008).

The value of property is ultimately a question of fact to be determined by the court. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

In the Tax Court, "a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. In this case, Plaintiffs are seeking relief and thus bear the burden of proof. This court has previously stated that "preponderance" means "the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)).

In cases where a property's RMV is at issue, as here, "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the RMV of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed

---

[3] An administrative rule promulgated by the Oregon Department of Revenue instructs that the three approaches to value--sales comparison, cost, and income--be considered in determining a property's value, but recognizes that all three approaches may not be applicable in a given case. OAR 150-308.205-(A)(2). Because the subject property is owner occupied and does not generate any income, neither party used the income approach in valuing Plaintiffs' property.

professionals such as appraisers, real estate agents and licensed brokers." *Lebeck v. Multnomah County Assessor* (*Lebeck*), TC-MD No 100404D at 3 (Feb 16, 2011).

Finally, the legislature has given the court jurisdiction "to determine the real market value or correct valuation on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.

B.  *Subject property*

1.  *Plaintiffs' purchase of the subject property*

The sale of the subject property can provide a useful indication of the value of the property. *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). The Oregon Supreme Court in *Kem* ruled that "[a] recent sale of the [subject] property * * * is important in determining its market value. *If* the sale is a recent, voluntary, *arm's length* transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Id.* (Citations omitted; emphasis added). However, the court in *Kem* emphasized "that a recent sale of the subject property is not necessarily *determinative* of market value and does not foreclose other methods of valuation[.]" *Id.* at 115 (emphasis added); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's length." *Kem,* 267 Or at 114.

Plaintiffs' December 2010 purchase for $175,000 was "recent" because the applicable assessment date is January 1, 2011, less than one month after their purchase. However, Plaintiffs purchased the property from Freddie Mac. According to their website, Freddie Mac is a federally established entity chartered by Congress in 1970 "to provide liquidity, stability and

affordability to the U.S. housing market," primarily through the "purchase [of] loans from lenders to replenish their supply of funds so that they can make more mortgage loans * * *." *Frequently Asked Questions About Freddie Mac,* Freddie Mac, (Oct 12, 2012, 4:37 PM), http://www.freddiemac.com/corporate/company_profile/faqs/?intcmp=AFCPFA. "Freddie Mac was placed into conservatorship [in September 2008] in order to help restore confidence in the company." *Id.* That fact (conservatorship) suggests Freddie Mac was found to be operating ineffectively. Moreover, because its primary business purpose is purchasing loans from lending institutions, Freddie Mac, like the many lenders it supports, are not truly in the business of buying and selling homes. When a home mortgage lender or the mortgage lien holder comes into possession of a home, it is typically because the buyer(s) walked away from the home for financial reasons or failed to keep up with the mortgage payments and the lender ultimately foreclosed on the property, finding itself in the position of having to sell it to recoup all, or at least some, of the outstanding loan balance.

As indicated above, Plaintiffs' acquisition from Freddie Mac was through an online bid process conducted after the property had been unsuccessfully listed for sale for more than two years (with an original list price of $359,900 in July 2008). Hirschfelder, who lives in Montana, testified that in October or November of 2010, he looked into the purchase of the subject property, which was listed for sale by a realtor at the time. The court was curious as to why a Montana resident would be purchasing a fairly large residential property in Oregon, to which Hirschfelder responded that his son lives in Oregon and moved into the subject property after Plaintiffs' purchase. Hirschfelder visits his son a couple of times of the year "when it snows in Montana."

/ / /

Concerning the auction, Hirschfelder testified that before he could make an offer, the property "went to bid," with Freddie Mac as the seller. Hirschfelder submitted a bid through an agent. Hirschfelder explained that he chose to use an agent because he was not familiar with the bidding process. The bidding process in this case was an "online" auction at RealtyBid.com through a company specializing in advertising and marketing properties owned by individuals and financial institutions. (Ptfs' Ex 21.) Hirschfelder submitted his bid in early November 2012. The auction closed on or about November 12, 2010. Hirschfelder testified that he was later notified by email that his bid did not meet the reserve amount. He then spoke with his agent and decided not to submit another bid. According to his testimony, Hirschfelder was notified four days later through his agent that his original bid was accepted.

The question, then, is whether Plaintiffs' purchase was arm's-length. "The Appraisal Institute explains that the term 'arm's-length' involves '[a] transaction between unrelated parties under no duress.' " *Hotchkiss Family Trust v. Linn County Appraiser*, TC-MD No 120097D at 5 (Aug 6, 2012) (citing Appraisal Institute, *The Appraisal of Real Estate* 305 (13th ed. 2008)). "This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Id.* (citing *Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 *2 (Mar 30, 2011)); *see also Knight Bridge Crossing, LLC v. Washington County Assessor*, TC-MD No 110238N, WL 176682 *4 (Jan 23, 2012) (concluding that a bulk sale of eight bank owned lots involves "nontypical market conditions"); *Yarbrough v. Marion County Assessor*, TC-MD No 070229C, WL 4440216 at *4 (Dec 12, 2007) (discussing foreclosure sales and atypical market conditions).

In at least one case, the Oregon Supreme Court considered the purchase of property by a taxpayer from a lending institution that acquired the property through foreclosure of its mortgage

loan to be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward* 293 Or at 588. In *Ward*, however, the lender that sold the property had obtained an independent appraisal that valued the property at the same amount for which it subsequently sold. In this case, Hirschfelder indicates that the reserve price for the public auction was $250,000 and that his $175,000 bid was initially rejected and then later accepted. Thus, in the end, Freddie Mac sold the property for 30 percent less than its minimum reserve price, which is presumably the least amount of money Freddie Mac expected, or at least hoped, it would receive for the property.

This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor* (*Brashnyk*), TC-MD No 110308, WL 6182028 *5 (Dec 12, 2011). Such an exception may be recognized by the court "where the majority of sales are distress, [because] it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

In *Brashnyk* the taxpayer succeeded in obtaining a reduction in the RMV of a 3,100 square-foot residential home purchased from a bank roughly four months after the applicable assessment date for $247,500, and the court reduced the RMV from $395,997 to $280,000 ($30,000 more than the $250,000 value the plaintiff requested at trial). *Brashnyk*, TC-MD No 110308. The court discussed the fact that the subject property was "bank-owned" at the time of purchase and that such circumstances often make the sale suspect. *Id*. However, the court was ultimately persuaded to reduce the RMV by the particular and somewhat compelling facts in that case, including the fact that the property had been listed for sale for almost five years, that the asking price had been reduced 12 times over that five-year period, and that the property's final

list price (less than two weeks after the applicable assessment date) was $273,900, a figure very close to the court's $280,000 RMV determination. *Id.*

That case can be contrasted with *Schnabel v. Clatsop County Assessor*, TC-MD No 100618D (Feb 22, 2011), where the court rejected the taxpayers' request for a reduction in the RMV of a residential condominium based on a purchase by the plaintiffs at an auction 11 and one-half months after the applicable assessment date. The court in *Schnabel* noted that "[a]n auction is defined as a 'sale of property to the highest bidder.' " *Id.* (citing *Webster's Third Int'l Dictionary* 142 unabridged ed 2002).) The court continued: "[a]n auction eliminates the negotiation between the buyer and seller and requires buyers to negotiate with each other, generally leaving the seller out of the negotiation process." *Id.* Another relevant factor in that case was that the taxpayers did not present any other value evidence, choosing instead to rely solely on the purchase price, whereas the assessor presented a value report that utilized six comparable sales of condominium units in the same building as the subject property. *Id.*

In another Decision of this court involving the sale of a bank-owned property, the court rejected the plaintiff's request for a reduction in the RMV of a 4,000-plus square-foot two story residential home built in 2000, stating that:

> "[a] property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months or more to find a buyer willing to pay a higher price."

*Kryl*, TC-MD No 100192B.

In the present case, Hirschfelder argues that his purchase meets all of the requirements of an arm's-length transaction because there was no duress and both parties were informed. In an

attempt to support that assertion, Plaintiffs submitted an excerpt from the Assessor's Certified Ratio Study Procedures Manual, which notes in Chapter 5 that among the sales that are "potentially usable" are "[t]ransfers by government agencies and financial institutions" provided that the sales are "confirmed." (Ptfs' Ex 2 at 3.) Hirschfelder also submitted excerpts from the Board of Property Tax Appeals Manual written by the Oregon Department of Revenue, dated January 2011. (Ptfs' Ex 3.) He drew the court's attention to page 16-2 of the Manual which, as part of its discussion of an arm's-length sale, explains that duress "means the seller was not compelled to sell the property for financial reasons, and the buyer was not compelled to purchase the property within a time period that's considered unreasonable." (*Id*. at 2.) Hirschfelder insists there was no duress because both he and the seller Freddie Mac used agents in the sale of the subject, and that duress is essentially doing something that someone "does not want to do." Hirschfelder testified that all owners make choices of whether or not to sell, although he acknowledges that there is "some compulsion" if the homeowner fails to make the required mortgage payments and the bank wants the home back. However, he insisted that that situation is not duress because the homeowner in that scenario is not living up to his or her end of the contract and "their actions caused them to be where they are." Hirschfelder went on to testify at length about what he believed to be an arm's-length transaction and what was and was not duress, concluding that the market is "messy, but that's what makes it wonderful." When queried by the court as to whether Hirschfelder felt that he "got a deal," he responded with the words: "not really," followed by the acknowledgment that he "got an extra 200 square-feet" of living space that he "did not know [he] was buying."

Given the facts outlined above regarding Plaintiffs' purchase of the subject property, the court finds that the purchase was not arm's-length and is therefore not indicative of the

property's RMV as of January 1, 2011. The home was sold at auction through an online bid with Freddie Mac being the record owner of the property. The home had been listed for sale for more than two years prior to Plaintiffs' purchase, there was an interim foreclosure in May 2010 with $285,000 owing on the property, followed by a new listing in June 2010 for $282,900, and the eventual auction after the November 9, 2010, $250,000 listing was removed. (Ptfs' Ex 19.) During the spring and summer months of 2010 (April through mid-September), the listing price for the property was between $295,000 and $255,000. (*Id*.) Plaintiffs paid $175,000 for the property, or approximately $57 per square-foot.[4] Plaintiffs paid $75,000 less than the final $250,000 listing price of early November 2010, which was the price just before the property was removed from the open market; Freddie Mac's $250,000 minimum reserve bid price posted roughly one week later (November 17, 2000). (*Id*.)

2. *Deferred maintenance*

In an attempt to establish the $175,000 purchase price as the market value of the property as of the January 1, 2011, assessment date, Hirschfelder submitted a number of documents he believed demonstrated that the property needed $60,500 worth of deferred maintenance and repairs. (Ptfs' Exs 22-24.) Subtracting that amount from the $250,000 Freddie Mac asking price, Hirschfelder contends that a more realistic "maximum fair market value adjusted for condition at the date of sale" was $189,500, which is less than 10 percent more than Plaintiffs paid for the subject property. (Ptfs' Ex 22.) The court has reviewed the testimony and supporting documents submitted by Hirschfelder and finds them unpersuasive. Many of the items are either simply cosmetic or typical for a 32-year-old home (built in 1978 and bought in December 2010).

---

[4] $175,000 ÷ 3,074 square feet = $56.92.

Defendant acknowledges that there were some "condition issues" affecting the property at the time of Plaintiffs' purchase and argues that the RMV originally placed on the assessment and tax rolls was based on an error in the square footage (2,844 square-feet in the records versus the actual square footage of 3,074). Defendant states that the RMV "would have been $289,290" if the value had been based on the correct square footage. (Def's Ex B at 4.) Defendant then notes that the BOPTA-reduced RMV of $250,000 allowed "up to $39,290 of cost to cure value," which Driskell felt was reasonable given his value range. (*Id.*)

C.     *Comparable sales approach*

The Department of Revenue (Department) may adopt rules "to regulate its own procedure." ORS 305.100. The Department promulgated OAR 150-308.205-(A)(2)(a), which states: "For the valuation of real property all three approaches – sales comparison approach, cost approach, and income approach – must be considered. For a particular property, it may be that all three approaches cannot be applied, however, each must be investigated for its merit in each specific appraisal." In this case, both parties relied on the sales comparison approach, with Plaintiffs also relying on their purchase price, discussed above.

1.     *Plaintiffs' value evidence*

Plaintiffs presented two types of valuation evidence. The first is a sales grid listing five sales occurring between May and December 2010 for prices ranging from a low of $200,000 to a high of $275,000. (Ptfs' Ex 18.) Hirschfelder adjusted the sales for age, neighborhood, and size, and derived adjusted sale prices ranging from a low of $150,237 to a high of $207,347. (*Id.* at 1.) Hirschfelder's largest adjustment was the single figure $32,953 for neighborhood adjustments, which he applied as a deduction to all five of his sales based on his determination that the subject property was in a "nonhomogeneous" neighborhood (whereas all

five of his comparable sales were in homogeneous neighborhoods). (*Id*.) Hirschfelder indicates in his valuation grid sheet that the $32,953 negative adjustment was derived by taking 15 percent of the absolute median sale price for all properties in Marion County in the "R46" class.[5] (*Id*.) Hirschfelder is not an appraiser and has no formal appraisal-type training. Hirschfelder did not demonstrate that his adjustments were market based. For example, his comparable sale number one was 18 years newer, and Hirschfelder made an $18,000 negative adjustment for the age difference ($1,000 per year). (*Id*.) However, neither his testimony nor his exhibit explains how he arrived at that figure. He adjusted his second comparable upwards $28,410 because that sale involved a home 30 years older. (*Id*.) Hirschfelder made other unexplained adjustments for differences in lot and home sizes where he felt the disparity was significant enough to warrant some adjustment. (*See id*.) The court is not persuaded by Hirschfelder's comparable sales valuation estimate.

Hirschfelder's second type of valuation evidence is a three-page table of all banks sales in the same zip code as the subject property that occurred in 2010, which is the year just prior to the applicable January 1, 2011, assessment date for the 2011-12 tax year. (Ptfs' Ex 6A.) Hirschfelder testified that there were 13 such sales in his zip code area, excluding his purchase, and that the bank made money on five of them. Hirschfelder also included bank sales data from a nearby zip code area and testified at trial that of the 19 sales in that zip code area, the institution made "some sort of profit" on 27 percent of the transactions. (*See* Ptfs' Ex 6B.) Driskell responded that the sales price often includes additional fees and that the prices reflected in the deed did not necessarily mean that the institution actually made a profit.

---

[5] The "R" stands for residential and the first digit (4) represents the property class as reflected in the assessor's records, the class scale ranging from a low of 1 to a high of 8. Driskell testified that a "5" would be "an average home." The court was a little unclear as to the meaning of the second digit (6); when asked by the court, Driskell testified that the subject property fell into the "6" class because it was a two-story home with an attic over the garage, etc. Hirschfelder simply testified that he "stayed with the R4 class."

Frankly, the question of whether a seller makes a profit or suffers a loss is irrelevant to the issue at hand, which is the RMV of the subject property on January 1, 2011. A person can buy a property in a rising market and later sell it in a falling market, experiencing a considerable loss in the process, but, if the sale price was an amount in cash (or equivalent terms) paid by an informed buyer to an equally informed seller, neither of which is acting under any compulsion, in a transaction that was truly at arm's-length (the price was not influenced by any type of personal relationship between the parties, neither was under any duress, etc.), then the sales price likely represented market value, which as this court has said in the past can vary by as much as 10 percent. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977) (noting that value is a range rather than an absolute). Having concluded that the bank foreclosure sale information Hirschfelder presented is irrelevant, the court finds Plaintiffs have failed to submit persuasive value evidence based on the sales comparison approach and, as such, they have failed to meet their statutory burden of proof under ORS 305.427.

As indicated above, the court has the statutory authority to determine the RMV of a property "on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.

2. *Defendant's value evidence*

Turning to Defendant's evidence, its appraiser Driskell submitted a valuation estimate based on four comparable sales, two occurring in mid-2011 (May and July) and the other two in mid- and late-2010 (July and October). (Def's Ex at 1-2.) Driskell determined that the RMV for the subject property was within the range of $280,642 (comparable # 4) and $315,030 (comparable #1). Driskell's analysis is not without its own flaws. For example, he made fairly significant "time" adjustments for the pre-assessment-date sales, comparables #3 and

#4 ($6,700 for a sale occurring on October 27, 2010 and $12,650 for a sale occurring on July 16, 2010), but no such adjustments for his two post-assessment-date sales, comparables #1 and #2, which sold on May 31, 2011, and July 22, 2011, respectively. (*Id.*) However, Driskell's report is, on the whole, more persuasive than any of the evidence submitted by Plaintiffs. Additionally, Driskell stated during closing, as well as in his report, that the $250,000 RMV as reduced by BOPTA from the original $274,380 RMV (that had appeared on the assessment and tax rolls before the BOPTA reduction), should be sustained because that number incorporates an amount to cure the condition issues (repairs and deferred maintenance) that both parties agree impacted the property at the time of Plaintiffs' purchase.[6]

The final piece of relevant valuation information that the court was made aware of during trial was that, roughly 30 days after Plaintiffs purchased the subject property, they had an appraisal done and the independent appraiser estimated the value of the home to be $275,000. That appraisal, which Hirschfelder refused to share with Defendant and did not submit into evidence, was made on or about January 19, 2011, less than three weeks after the January 1, 2011, assessment date for the 2011-12 tax year. That value is remarkably close to the $274,380 RMV Defendant placed on the assessment and tax rolls for the 2011-12 tax year, a value subsequently reduced by BOPTA to $250,000. As noted above, Defendant has simply asked the court to sustain the $250,000 BOPTA-reduced RMV.

### III. CONCLUSION

After a thorough review of the evidence, both documentary and testimonial, guided by the relevant rules and regulations (legislative, administrative, and judicial) applicable to the issue

---

[6] Hirschfelder insists that there were considerably more maintenance and repair problems than Driskell found, and, after reviewing the evidence and in light of the testimony, the court finds that Driskell presented a more realistic assessment of the condition of the property in December 2010.

presented, which is the real market value as of January 1, 2011, of the subject property identified in the Assessor's records as Account R93190, the court concludes that the $250,000 value found by the Marion County Board of Property Tax Appeals should be sustained. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ___ day of October 2012.

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on October 25, 2012. The Court filed and entered this document on October 25, 2012.*